IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MADJID TAVANA,                          :
                                        :
              Plaintiff,                 :     CIVIL ACTION
                                        :
     v.                                 :     No. 06-cv-4376
                                        :
LA SALLE UNIVERSITY,                    :
                                        :
              Defendant.                :

## MEMORANDUM AND ORDER

Joyner, J.                                         November 14, 2007

        Presently before the Court is Defendant La Salle
University's ("La Salle" or "Defendant")) Motion for Summary
Judgment ("D. Mot.") (Doc. No. 15), Plaintiff's Response ("P.
Resp.") (Doc. No. 16), Defendant's Reply ("D. Rep.") (Doc. No.
44), Plaintiff's Surreply ("Surreply") (Doc. Nos. 46, 49), and
Defendant's Response to the Surreply (Doc. No. 51).  For the
reasons set forth below, the Court GRANTS in PART and DENIES in
PART Defendant's motion.


## BACKGROUND

     This case arises out of three separate decisions made by
employer LaSalle University, Defendant in this case: (1) Failing

to reappoint Plaintiff to his position as Chair of the Management Department at the School of Business; (2) Awarding Plaintiff a two-year, rather than four-year, Lindback Professorship grant; and (3) failing to consider Plaintiff's application for the position of Dean of the School of Business.

*Failure to Reappoint Plaintiff as Management Department Chair*

Plaintiff Madjid Tavana has been teaching in the Management Department at LaSalle's School of Business ("SB") since 1984, and has been a tenured Full Professor there since 2004. In May, 1993, at the recommendation of the members of the Management Department, the SB Dean appointed Plaintiff to be Chairperson of the Management Department for a four-year term. He was twice reappointed to four-year terms in that position, in 1997 and 2001. As Chair, Plaintiff taught two fewer courses each year and received an additional annual stipend of approximately $6000. SB Department Chairs also schedule classes and professors, recruit adjunct faculty, and oversee the performance and development of the faculty within their respective departments.

On May 3, 2005, at the end of Plaintiff's third four-year term as Chair, members of the SB Management Department faculty unanimously recommended that Plaintiff be reappointed to a fourth term. However, SB Dean Gregory Bruce declined to reappoint

Plaintiff as Chair, despite several more unanimous votes in favor of Plaintiff by the Management Department faculty in May and June of 2005.

After being denied reappointment as Chair, on June 1, 2005, Plaintiff filed a grievance against Dean Bruce and Dr. Richard Nigro, the University Provost, pursuant to the University Faculty Mediation and Grievance Policy. In his complaint to Elizabeth Paulin, the president of the La Salle faculty senate, Plaintiff asserted that his rejection from the Chair position was in "retaliation for several differences" he, Bruce, and Nigro had had during his tenure as Chair. (D. Mot. Ex. Q-2). He further argued that "[t]he actions of Dean Bruce and Dr. Nigro have been harassing and discriminatory . . . [and] have arbitrarily caused the loss of compensation and maliciously tarnished my reputation." (Id.). He summarized his claim by saying "[i]n short, the Dean and Provost are removing me from this position because of my unwillingness to carry out their inconsistent policies, not because I have been Chair for too long or not fulfilled my responsibilities." (Id.) The remainder of his complaint listed a number of specific events and disagreements involving Plaintiff, the Dean and the Provost that led to the grievance.

After Bruce and Nigro declined to participate in University-prescribed mediation, Plaintiff submitted his grievance to the University Grievance Committee, which rejected his claim. Plaintiff appealed to the University President, and again his grievance was denied.  Pursuant to University policy, Plaintiff, an Iranian Muslim, then filed a complaint with the University's Affirmative Action Officer on November 14, 2005.  Plaintiff again argued that the Chair reappointment decision was "rooted in retaliation and discrimination" and referred to the allegations made in his original grievance.  The complaint also described a conversation between Plaintiff and Dean Bruce in which Bruce allegedly stated that "it seems like all Iranians have a problem with authority" and that "the Provost did not appreciate [Plaintiff] leading a one man jihad against him."  (D. Mot. Ex. D-1).  Before an investigation was fully conducted by the University, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and with the Pennsylvania Human Relations Commission ("PHRC").

*Application for Lindback Professorship Chair*

In June, 2005, Plaintiff applied for a Lindback Professorship chair, a $7500-per-year award given to applicants from the SB faculty who have excelled in publishing and scholarly

4

pursuits.  The initial decision on who would receive Lindback awards was made by the "chair group," comprised of Dean Bruce, Associate Dean Joe Ugras, and the four SB department chairs, including Plaintiff.  The SB Dean then adopted the group's decision and the Lindback Professorship awards were given out.

The group agreed that Lindback chairs would be given to anyone meeting a list of specified criteria regarding publishing activity, position (i.e. Associate Professor or higher), and development of programs to encourage faulty scholarship.  (D. Mot. Ex. S).  The group also agreed that Plaintiff satisfied the requisite criteria, and that he and two other SB faculty - James Smither and Susan Borkowski - would receive Lindback chair awards.  However, while Smither was given a four-year Lindback Professorship award, Plaintiff and Borkowski received only two-year awards.  When his award expired, Plaintiff successfully applied for renewal of his award and was granted a four-year Lindback chair, to expire in 2011.

*Plaintiff's Application for SB Deanship*

In August, 2005, Bruce resigned from his position as Dean of the School of Business.  Nigro named Paul Brazina, an Assistant Professor in the SB Accounting Department, Interim Dean and assembled a Dean search committee made up of five SB faculty

members (including Brazina), two members of the business school advisory council, and himself.  The search committee established a three-phased approach to reviewing applicants for the position. They first reviewed candidate applications and, following a roundtable discussion and using predetermined criteria, selected ten candidates to continue to the next phase.  The second phase comprised a video interview of the ten selected applicants, who were asked a set of prepared questions.  The search committee then invited five candidates to the University for interviews.

On November 16, 2005, Plaintiff submitted an application to the search committee for the deanship position.  However, he was not chosen to participate in the second-phase video interviews, and on November 28, 2005, was informed that he would no longer be considered for the position.  After the search committee's ultimate selection for Dean withdrew his application, the search process was renewed and Plaintiff again submitted an application for the position in August, 2006.  At the time he filed his complaint, Plaintiff had not received a decision on his second application; however, in October, 2007, Brazina was named Dean of the School of Business, thus ending the search process.

6

*This Lawsuit*

On December 22, 2005, Plaintiff filed his complaint with the EEOC and the PHRC.  On August 8, 2006, the EEOC issued a Notice of Right to Sue to Plaintiff, who filed this action on October 8, 2006.  Plaintiff alleges that Defendant, through its decision-making agents, discriminated against him on the basis of his national origin and religion, in violation of Title VII and the Pennsylvania Human Rights Act (PHRA).  Specifically, Plaintiff claims that Defendant discriminated against him in refusing to reappoint him as chair of the Management Department, failing to award him a four-year Lindback Research grant, and failing to "properly consider" him for the SB deanship position.  He also alleges that, in response to his filing a grievance with the university after his failure to be reappointed as MIS chair, Defendant retaliated against him in making its decisions on his applications for the Lindback grant and SB deanship.


STANDARD OF REVIEW

It is recognized that the underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense.  Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).  Summary judgment is proper "if there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine only if there is sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 456 F.3d 418, 423 (3d Cir. 2006), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the non-moving party bears the burden of persuasion at trial, "the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." Id., quoting Wetzel v. Tucker, 139 F.3d 380, 383 n. 2 (3d Cir. 1998). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. See Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000).


## DISCUSSION

Defendant moves for summary judgment on all three claims of discrimination and both claims of retaliation alleged by Plaintiff. We will address each in turn. As an initial matter, we note that we apply the same legal standard for claims brought under the PHRA as we do for claims brought under federal anti-

8

discrimination laws addressing the same subject matter.  <u>See</u>
<u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir. 1996).  Thus,
our analysis of, and decision on, Plaintiff's discrimination
claims under Title VII apply equally to his claims under the
PHRA, as they are based on the same alleged conduct.

A.  Disparate Treatment Claims

    Claims of unlawful discrimination under Title VII are
analyzed under the burden-shifting paradigm established in
<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).
Under that standard, a Title VII plaintiff must establish a prima
facie case by demonstrating: (1) he is a member of a protected
class; (2) he was qualified for each position sought or held; (3)
he was discharged from or denied that position; and (4) non-
members of the protected class were treated more favorably.  <u>Id.</u>;
<u>see also</u> <u>Economos v. Scotts Co.</u>, 2006 WL 3386646, at *5 (E.D. Pa.
Nov. 21, 2006).  If the plaintiff succeeds in establishing a
prima facie case, the burden then shifts to the employer to
articulate a legitimate, non-discriminatory reason for each
decision.  <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Abramson v.</u>
<u>William Paterson College of N.J.</u>, 260 F.3d 265, 282 (3d Cir.
2001).  Once the employer has done so, the burden shifts back to

the plaintiff to demonstrate that the proffered reasons are pretextual.  Id.

Plaintiff has alleged that Defendant discriminated against him in making three separate employment-related decisions.  We apply the *McDonnell-Douglas* standard to, and determine if there are any genuine issues of material fact for, each employer action separately.[1]

1.  Failure to Reappoint as Chair of Management Department

Plaintiff first asserts that in declining to reappoint him chair, Defendant discriminated against him on the basis of his religion and national origin.  Defendant admits that the elements of the prima facie case are met here - Plaintiff, an Iranian Muslim, is a member of a protected class; he was qualified to be the chair, a position which was denied to him; and a nonmember of

---

[1] Title VII discrimination claims may also be grounded in a "mixed motive" theory, where both legitimate reasons and illegitimate, discriminatory reasons are involved.  See Price Waterhouse v. Hopkins, 490 U.S. 228 (1990); Watson v. SEPTA, 207 F.3d 207, 215 (3d Cir. 2000).  This standard, which presents a higher bar than the "pretext" rubric, calls for the plaintiff to show that the unlawful motive was a motivating factor in the adverse employment action.  See id.  Plaintiff briefly invokes this standard in his response to Defendant's Motion.  However, as we discuss below, we can dispose of the Motion without using a "mixed motive" analysis, and thus do not apply it here.  See Weldon v. Kraft, Inc., 896 F.2d 793, 800 n.4 (3d Cir. 1990).

his class - Professor Prafulla Joglekar, an Indian Hindu - was
named Chair instead.

Defendant argues, however, that the University had several
nondiscriminatory reasons for declining to reappoint Plaintiff as
Chair.  In particular, the University points to evidence that
supports the following reasons for making this decision: (1)
Bruce and Nigro thought that Plaintiff was driving off talented
faculty within his department; (2) Plaintiff did not cooperate
with the administration's wishes on class scheduling; (3)
Plaintiff assigned senior faculty to entry-level classes, in
contradiction with Dean Bruce's wishes; (4) Plaintiff repeatedly
scheduled himself for course overloads to receive additional
compensation, in contradiction with Dean Bruce's directives; and
(5) Plaintiff openly clashed with Bruce and Nigro and engaged in
"insulting and demeaning behavior" towards them.  (D. Mot. pp. 7-
11).  In support of these allegations, Defendant cites the
deposition testimony of several faculty members in the Management
Department, Dean Bruce, and Dr. Nigro.  All of these assertions
are legitimate, non-discriminatory reasons for declining to
reappoint Plaintiff as Chair, particularly because they relate
directly to the nature of the position.

Thus, the burden shifts back to Plaintiff to show that the
reasons given by Defendant are mere pretext for discriminatory

11

animus.  At this step, Plaintiff may avoid summary judgment by pointing to evidence that "(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 762 (3d Cir. 1994).  Although Defendant has put forth a number of non-discriminatory reasons for the chair appointment decision, Plaintiff "need not . . . offer evidence sufficient to discredit all of the rationales advanced by the employer." <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006).  Rather, if Plaintiff "manages to cast doubt on a fair number of them, [he] may not need to discredit the remainder." <u>Id.</u> (quoting <u>Fuentes</u>, 32 F.3d at 764 n. 7).

We find that Plaintiff has carried his burden at the third step of the *McDonnell-Douglas* analysis.  Defendant's proffered reasons can be separated into two categories: interpersonal difficulties and a failure to carry out administrative directives.  With respect to both of these groups of reasons, Plaintiff has pointed to evidence that casts enough doubt so that a "reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the

12

asserted non-discriminatory reasons." <u>Fuentes</u>, 32 F.3d at 765 (citations omitted).

First, and perhaps most significantly, Plaintiff has pointed to evidence that creates an issue of fact on several of Defendant's purported reasons for the appointment decision. Specifically, deposition testimony from Bruce, Nigro, and several faculty members shows that there may have been issues contributing to faculty departures that had little to do with Plaintiff's actions.  Plaintiff also points to deposition testimony by his replacement, Prof. Joglekar, that he was not pressured by the administration to schedule classes in a certain way and that in fact scheduling remained the same even after Plaintiff was not reappointed.  Finally, Plaintiff has also shown that with respect to course overloads, Dean Bruce admitted in his deposition that he actually *approved* all of Plaintiff's overload requests made before the grievance was filed, and Plaintiff points to a number of places in the testimony which create a dispute as to whether overloads were actually an issue.  All of this evidence creates numerous issues of fact that could lead a reasonable juror to find that the reasons related to Plaintiff's alleged administrative failures were pretextual.

Plaintiff also asserts that Bruce and Nigro made discriminatory comments related to religion and/or national

13

origin.  In particular, he claims that Bruce told him that Nigro
had referred to him as starting a "one-man jihad" over policy
differences, and that Bruce then noted that "all Iranians have a
problem with authority . . . .  Look what you did to the Shah."
In his deposition, Bruce admitted that he made comments like this
to Plaintiff.  (P. Resp. Ex. B, pp. 161, 171).  Plaintiff also
points to evidence that some at the University discussed or
expressed a preference for hiring Catholics.  (Bruce Deposition,
P. Resp. Ex. B, p. 192; McGinniss Deposition, P. Resp. Ex. J, p.
30).[2]  Our Court of Appeals has held that in employment
discrimination cases, employer comments reflecting evidence of
bias may contribute to an inference of discriminatory animus that
would cast doubt on the defendant's proffered justifications.
See Roebuck v. Drexel Univ., 852 F.2d 715, 733 (3d Cir. 1988);
see also Campetti v. Career Educ. Corp., 2003 WL 21961438, at *11
(E.D. Pa. June 25, 2003).  Here, the comments made by University
administrators are directly related to Plaintiff's religion and
national origin and a possible preference for candidates of other
religious faiths, and thus may create an inference for a

---

[2] Though Defendant disputes Plaintiff's reading of this
deposition evidence, for purposes of this Motion we must make any
inferences about it in a way that favors the Plaintiff.

14

reasonable juror that the chair decision was based on discriminatory animus.

Finally, Plaintiff contends that the explanations offered by Defendant in its Motion differ from those it actually gave Plaintiff when informing him of the decision not to reappoint him.  In particular, Plaintiff points to emails from Dean Bruce shortly after the decision was made explaining that twelve years (the length of time Plaintiff had already acted as Chair) was "too long" for one person to serve as a Department Chair, even though Chairs in other University departments had served far longer than that.  (P. Resp. Exs. B-7, B-11).  He also points to portions of Bruce's and Nigro's depositions and the notes of Brother Willard, the University investigator of Plaintiff's grievance, in which the Dean and Provost provided still other reasons to the University investigator, for example: Plaintiff delayed meetings with the Provost; Plaintiff led opposition to the restructuring of the School of Business; the planned SB restructuring was going to eliminate Plaintiff's position; and a decline in majors in Plaintiff's department.  (P. Resp. Exs. B, C).  The Third Circuit has noted that, in a pretext analysis, "[i]f a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this

may be viewed as evidence tending to show pretext." <u>Abramson</u>,
260 F.3d at 284.  Here, Plaintiff has shown that the University
has offered myriad justifications for its decision not to
reappoint him as Chair, and that these have changed over time.
Thus, this too may imply that the reasons asserted by Defendant
in its Motion here are pretextual.

In consideration of all of the above evidence, we conclude
that there are genuine issues of fact as to whether the
rationales proffered by Defendant for the chair reappointment
decision were mere pretext for discrimination.  Accordingly, we
must deny Defendant's Motion for Summary Judgment with respect to
Plaintiff's claim that Defendant discriminated against him in
failing to reappoint him Chair of the Management Department.


2.  Lindback Chair Award of Two, Rather than Four, Years
Plaintiff also contends that Defendant discriminated against
him in awarding him a two-year, rather than four-year, Lindback
Professorship chair.  The prima facie case for unlawful
discrimination requires that the plaintiff show that he was
discharged from or denied the position sought - in other words,
that he suffered an "adverse employment action sufficient to
evoke the protection of Title VII and the PHRA." <u>Jones v. School
Dist. of Phila.</u>, 198 F.3d 403, 411 (3d Cir. 1999).  The Third

16

Circuit has defined an "adverse employment action" as one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001)(quoting <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300 (3d Cir. 1997)).   An employment action may still be considered "adverse" even if there is no change in compensation, such as the transfer of an employee which would prevent him from teaching his preferred subject.  <u>See</u> <u>Jones</u>, 198 F.3d at 41.

Plaintiff's receipt of the Lindback Professorship for a two-year period, particularly when he was not foreclosed from applying for renewal of the award, does not fall within our Court of Appeals' definition of "adverse employment action."   The yearly monetary award of $7500 is the exact same amount that Smither, the recipient of the four-year award, received and thus there is no discernible difference in his yearly compensation. The mere fact that Plaintiff had to apply for renewal of his award after two years, while Smither did not, also does not alter the "terms, conditions, or privileges" of his employment. Moreover, there is absolutely no evidence that this award was mandatory for those who met the criteria, and in fact the "advertisement" of the award states that while the Chair Group reviews applications, the "Dean makes final awards."  (P. Resp.

17

Ex. E-2).  Numerous district courts, including this Court, have found that non-receipt of a discretionary award does not constitute an "adverse action."  <u>See</u> <u>Seldon v. Nat'l R.R. Passenger Corp.</u>, 2007 WL 3119976, at *4 n.4 (E.D. Pa. Oct. 24, 2007); <u>Haas v. Zurich N. Am.</u>, 2006 WL 2849699, at *4 (N.D. Ill. Sept. 29, 2006); <u>Hazelett v. Brownlee</u>, 2007 WL 2257635 (S.D. W. Va. Aug. 3, 2007); <u>Schamann v. O'Keefe</u>, 314 F. Supp. 2d 515, 531 (D. Md. 2004).  Thus, even Plaintiff's attempt to recharacterize the decision as the "denial" of a four-year term does not transform the grant of a two-year award into an "adverse action."

In sum, a reasonable juror could not find that this award was an "adverse employment action," and Plaintiff thus fails to make out a prima facie case for discrimination with respect to the award of the two-year Lindback Grant.[3]  Accordingly, we must grant Defendant's Motion with respect to this part of Plaintiff's claim.

---

[3] An "adverse employment action" is also required under a "mixed motive" analysis.  <u>See</u> <u>Watson</u>, 207 F.3d at 215 (noting that the Plaintiff must demonstrate that an adverse decision was the result of mixed motives to shift the burden to the employer).  Thus, Plaintiff's claim also fails under this theory.

3.  Failure to Consider for Position of SB Dean

Finally, Plaintiff asserts that Defendant discriminated against him on the basis of religion and national origin in failing to "properly consider" him for the SB deanship.  For the purposes of this Summary Judgment Motion, we can only assume that "proper consideration" would have been, at the very least, advancing his application past the first phase of the search process.  Defendant argues that Plaintiff was not qualified to be Dean according to the criteria established by the Dean search committee, and that the committee rejected his application because they decided that he did not meet their predetermined requirements.[4]  However, as is required to establish a prima facie case for this claim, Plaintiff has created at least a genuine issue of fact as to whether he was qualified.  Several faculty members not on the search committee opined in their depositions that Plaintiff was qualified to be Dean, and was perhaps the *most* qualified candidate.  (P. Resp. Exs. F, G, H). This is sufficient evidence to create a dispute about whether

---

[4]Evidence in the record shows that the search committee used the following criteria in evaluating candidates for the deanship: fundraising ability and experience; experience in administration and management of a large academic unit; capacity to work with faculty in a collegial and collaborative manner; experience with the AACSB accreditation process; and having a well-articulated vision for the SB, with a focus on cultivating new programs and drawing new students into the school.  (D. Mot. p. 16).

Plaintiff was indeed qualified that should survive summary judgment.  Defendant does not dispute that the other elements of the prima facie case are met, and we have already noted that they are satisfied in this case.  Accordingly, Plaintiff satisfies the first *McDonnell-Douglas* stage with respect to his rejection for the deanship.

Thus, again the burden shifts to Defendant to provide any legitimate, non-discriminatory reasons for rejecting Plaintiff's application in the first stage of the search process.  Defendant asserts that committee members gave the following reasons for declining to advance Plaintiff's application in the search process: (1) Plaintiff lacked fundraising experience; (2) Plaintiff had no experience as a dean or associate dean and had no university-wise leadership experience beyond a small department; (3) Plaintiff did not work cooperatively with SB faculty and the University administration, in particular Provost Nigro; (4) Plaintiff's strength - his record of publications - was relatively unimportant for an administrative position; and (5) Plaintiff offered no explanation for why he wanted to be SB Dean or what he hoped to accomplish.  (D. Mot. pp. 17-18).[5]  In

---

[5] Defendant also claims that search committee members did not know of Plaintiff's religion or national origin and did not take either one into account in making their decision.  It is unclear whether Defendant intends for this to be a proffered justification as well, but in case, there is sufficient evidence

other words, Defendant contends that he wasn't "qualified" under
the committee criteria.  Plaintiff responds that, as we have
already noted, other faculty members testified that he was
qualified, and created issues as to whether he actually did meet
the criteria cited by Defendant.  In particular, several faculty
agreed that Plaintiff was more qualified than another candidate -
Jeannie Welsh, a member of the Accounting Department - whose
application made it past the first phase of the process.  (D.
Resp. Ex. H p. 88; Ex. G p. 134; Ex. F p. 229).  Joglekar also
stated that Plaintiff would be a better fundraiser than Welsh and
had a "better vision" for the school and a "better personality."
(D. Resp. Ex. H p. 88).  Another professor testified that
Plaintiff was very well-respected by faculty across the
university, notably for his managerial skills.  (Berry Dep., D.
Resp. Ex. F pp. 229-30).  All of this testimony together creates
disputes about several of the proffered justifications, and is
sufficient to create enough doubt that a reasonable juror could
conclude they are pretextual.  Accordingly, Plaintiff has carried
his burden at the third *McDonnell-Douglas* step, and summary

---

in the record to create a genuine issue of fact as to whether the
committee knew that Plaintiff was an Iranian Muslim.  Plaintiff
points to numerous pieces of testimony by faculty members that
his religion and national origin were "common knowledge" or at
least likely to be known by the committee.

judgment must be denied as to the University's rejection of
Plaintiff for the deanship.


B.  Retaliation Claims

     Plaintiff also claims that Defendant took retaliatory action
against him for grieving that the university had discriminated
against him, in violation of Title VII, 42 U.S.C. § 2000e-3(a),
and the PHRA, 43 Pa. Cons. Stat. § 955(d).  Title VII and the
PHRA make it unlawful for an employer to discriminate against an
employee who has opposed practices made illegal by Title VII or
the PHRA, or because she participated in an investigation or
proceeding under those statutes.[6]  Id.  To succeed on his claim
of unlawful retaliation, Plaintiff must demonstrate: (1) he
engaged in an activity protected by Title VII; (2) after or
contemporaneous with engaging in that conduct, his employer took
an adverse action against him; (3) the adverse action was
"materially adverse"; and (4) a causal link exists between his
participation in the protected activity and the employer's

---

     [6]We reiterate that our analysis for Plaintiff's retaliation
claim under the PHRA will be the same as it would be for the
Title VII retaliation claim.  Thus, though we specifically
address Title VII here, our conclusions apply equally to the PHRA
claim.

adverse action.  See Hare v. Potter, 220 Fed. Appx. 120, 127 (3d
Cir. 2007)(citing Burlington N. & Santa Fe Ry. Co. v. White, 126
S. Ct. 2405, 2415 (2006)).  To satisfy the third, "material
adversity," prong, Plaintiff must prove that the action "well
might have dissuaded a reasonable worker from making or
supporting a charge of discrimination."  Id. at 128.  If
Plaintiff establishes a prima facie case of retaliation, the
burden shifts to Defendant to advance a legitimate,
nonretaliatory or nondiscriminatory reason for its actions.  Id.
at 127.  If Defendant has done so, the burden shifts back to
Plaintiff to prove that the nonretaliatory or nondiscriminatory
reason is merely a pretext for discrimination.  Id.

Plaintiff has alleged that Defendant discriminated against
him in making two separate employment-related decisions.  As we
did with the substantive discrimination claims, we apply the
Title VII anti-retaliation standard to each employer action
individually.


1.  Retaliation by Award of Lindback Grand for Two, Rather
than Four, Years

As we have already explained, the decision to award
Plaintiff a two-year, rather than four-year, Lindback chair is
not an "adverse action," and thus Plaintiff cannot establish a

prima facie case for retaliation under Title VII.  Plaintiff
notes, however, that with respect to Title VII's anti-retaliation
provision, we must more broadly interpret the "adverse action"
requirement, under the command of the Supreme Court's recent
decision in <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S. Ct.
2405, 2415 (2006).  In that case, the Supreme Court held that
retaliatory actions prohibited by Title VII should not be limited
to conduct that "affects the employee's compensation, terms,
conditions, or privileges of employment."  <u>Id.</u> at 2411.
Nevertheless, we find that the award of the two-year Lindback
grant was not a "materially adverse" action because we cannot
conceive how the actual granting of a yearly stipend of identical
value to the four-year chair, with the option to apply for
renewal, would "dissuade a reasonable worker from making or
supporting a charge of discrimination."

    Furthermore, even if the grant of the two-year Lindback
chair could be considered a "materially adverse" action, we must
still grant summary judgment to Defendant on this claim because
Defendant has proffered a legitimate, nondiscriminatory reason
for the decision.  Specifically, Defendant points to evidence in
the record that shows that the Chair Group and the Dean initially
granted only one person a four-year chair at first so that the
awards would be staggered and renewed on a rotating basis.  (Def.
Mot. pp. 20-21).  We find this to be a legitimate,
nondiscriminatory reason for awarding a two-year, rather than

four-year, Lindback chair to Plaintiff and Borkowski.  Plaintiff has not even attempted to prove that this reason is mere pretext for discrimination or retaliation, and thus has not carried his burden.  Accordingly, we must grant summary judgment for Defendant on this claim.

2.  Retaliation for Grievance Filings by Failure to Consider for Position of SB Dean

Plaintiff also claims that his rejection from the search process for the SB dean was an act of unlawful retaliation in response to his formal grievance.  Defendant's main argument here is that Plaintiff did not engage in "protected activity" until he filed his complaint with the Affirmative Action Officer on November 14, 2005, and the committee thus could not have considered it in their November 18, 2005 decision.  How this bears on the prima facie case isn't made clear by Defendant, but we interpret the argument to be that there is no causal connection between the complaint and the committee's decision. As Plaintiff points out, however, Provost Nigro - a member of the search committee - received the email to the Affirmative Action officer which constituted the complaint before the committee made its decision.  (D. Mot. Ex. D-1).  Defendant would have us infer that because there was only a four-day window between that complaint and the search committee's decision, it could not have factored into that decision.  However, we must make all

25

reasonable inferences in favor of the Plaintff, and the question of what committee members knew and how it factored into their decision is the type of issue that is not suitable for summary judgment in this case. See Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007)(noting that "issues such as intent and credibility are rarely suitable for summary judgment"). Because there are genuine issues of fact as to whether there is a causal link between Plaintiff's complaint of discrimination and his rejection from the deanship search process, we cannot grant summary judgment to Defendant based on Plaintiff's failure to establish a prima facie case.[7]

Defendant also asserts that the University had legitimate, non-discriminatory reasons for rejecting his dean application, referring to the same reasons it gave for Plaintiff's substantive discrimination claim. As we have already explained, however, Plaintiff has created enough of a dispute about Defendant's purported rationales that a reasonable jury could find them to be pretextual. Accordingly, we must deny summary judgment on this claim.

---

[7] The parties dispute whether Plaintiff's first grievance, in June, 2005, constitutes "protected activity" because he did not specifically claim discrimination on the basis of religion and national origin at that time. They agree, however, that his November 14, 2005, email to the Affirmative Action Officer does make such a claim. Because that latter email alone provides a basis to deny summary judgment to Defendant, we need not decide here whether the first grievance was in fact "protected activity" under Title VII.

C.  Conclusion

There are genuine issues of material fact regarding
Plaintiff's claims of discrimination in declining to reappoint
him Chair and discrimination and retaliation in rejecting his
deanship application.  Defendant's Motion for Summary Judgment as
to these claims must therefore be DENIED.  However, because no
reasonable jury could consider the award of a two-year, rather
than four-year, Lindback Professorship an "adverse employer
action," summary judgment is appropriate as to that part of
Plaintiff's complaint.  Thus, with respect to Plaintiff's claim
of discrimination and retaliation in failing to award him a four-
year Lindback Professorship, Defendant's Motion for Summary
Judgment is GRANTED.  An order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MADJID TAVANA,              :
                              :
            Plaintiff,        :     CIVIL ACTION
                              :
     v.                         :     No. 06-cv-4376
                              :
LA SALLE UNIVERSITY,       :
                              :
            Defendant.        :

<u>ORDER</u>

AND NOW, this     14th     day of November, 2007, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 15), and Plaintiff's responses thereto, for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART. Judgment as a matter of law is hereby ENTERED in favor of Defendant on Plaintiff's claims of discrimination and retaliation as to the award of the Lindback Professorship, and Defendant's motion on Plaintiff's remaining claims is DENIED.

BY THE COURT:

<u>s/J. Curtis Joyner</u>
J. CURTIS JOYNER, J.